**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| BONNIE HEATHER MILLER, ROBERT WILLIAM ALLEN, ADELLA DOZIER GRAY, and ARKANSAS VOTERS FIRST, <br><br> *Plaintiffs,* <br><br> v. <br><br> JOHN THURSTON, in his official capacity as Secretary of State of Arkansas, <br><br> *Defendant.* | Case No. 5:20-cv-05070-pkh <br><br> Hon. Paul K. Holmes, III |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

The people of Arkansas have a fundamental right guaranteed by their Constitution to adopt constitutional amendments through ballot initiatives. Plaintiffs have a fundamental right guaranteed by the First and Fourteenth Amendments of the U.S. Constitution to advocate for such initiatives. In the current COVID-19 pandemic, Arkansas law is unduly burdening Plaintiffs' rights, to the detriment of the citizens of this state. Plaintiffs seek a preliminary injunction against this unconstitutional application of Arkansas's requirements for constitutional amendments.

Plaintiffs are the sponsor, volunteer canvasser, and supporters of an initiative for the November 2020 election to adopt an independent redistricting commission to empower voters, not politicians, to draw district lines. Arkansas law requires that they obtain over 89,000 signatures before July 3, that the voters sign the petitions in-person in the presence of the canvasser, and that the canvasser sign an affidavit in the presence of a notary. These requirements are onerous under

normal conditions. But the COVID-19 pandemic, and the restrictions imposed by federal, state, and local authorities on in-person contact to reduce the spread of the virus, have made the signature gathering requirements impossible to satisfy.

Canvassers cannot circulate petitions and witness the signing of petitions without coming within six feet of a voter. And even if they could, the public events, gatherings, and businesses at which canvassers collect signatures have all been shuttered. A substantial number of Arkansans are at high risk if they contract the virus and have been advised to isolate and avoid all contact, foreclosing their ability to show their support for Plaintiffs' petition. And any effort to engage in door-to-door canvassing would be contrary to public health guidelines and restrictions, and would undermine efforts to reduce the spread of the virus.

As a result of the current health crisis and the understandable restrictions imposed to combat it, Plaintiffs cannot satisfy Arkansas's signature gathering requirements. Because Plaintiffs cannot comply with both Arkansas's signature gathering requirements and the requirements that they avoid in-person interactions such as canvassing for voters' signatures, they seek relief from this Court—as applied to them in the context of the current pandemic crisis—to ease the burden of the signature gathering requirements. As explained below, Plaintiffs seek the ability to gather signatures electronically, to ease in-person witnessing and notarization requirements, and to lower the required number of signatures and extend the deadline for submission of signatures. This as-applied relief is carefully tailored to the reality of the current crisis, but also accomplishes the state's interests in ensuring supporting signatures are verified and that the initiative has demonstrated widespread support among voters.

## FACTUAL BACKGROUND

### I.      Petition Signature Gathering Requirements

Under the Arkansas Constitution, "the people reserve to themselves the power to propose . . . amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly." Ark. Const. art. 5, § 1. Initiative petitions must be filed with the Secretary of State "not less than four months before the election"—this year by July 3, 2020—and must be proposed by ten percent of the legal voters. *Id.* Those signatures must "come from at least fifteen of the counties of the State" and bear the signatures "of not less than one-half of the designated percentage of electors of such county." *Id.* The requisite number of signatures is measured by the total votes cast in the most recent gubernatorial election. *Id.* For the 2020 election, a proposed constitutional amendment must be accompanied by 89,151 signatures.[1] The Constitution sets lower limits for a statutory proposal (eight percent) and calling a referendum against a law adopted by the legislature (six percent). *Id.* The initiative and referendum provision of the Constitution is "self-executing . . . but laws may be enacted to facilitate its operation." Ark. Const. art. 5, § 1.

The legislature has enacted a number of such laws. The petition must be "prepared and circulated in fifteen (15) or more parts or counterparts," each an exact copy of the others. Ark. Code § 7-9-108(a). Each part must have a canvasser's affidavit attached and must certify "that all signatures appearing on the petition part were made in the presence of the affiant, and that to the best of the affiant's knowledge and belief each signature is genuine and each person signing is a registered voter." *Id.* § 7-9-108(b). The canvasser's affidavit must be notarized. *Id.* § 7-9-109(a). Each "part" of the petition must be limited to signatures from a single county. *Id.* § 7-9-108(d).

---

[1]   *See* Ark. Sec'y of State, 2020 Initiatives and Referenda Handbook at 2, https://www.sos.arkansas.gov/uploads/2019-2020_I__R_Handbook_-_Jan_2020.pdf (last visited Apr. 21, 2020).

The voter's signature must be accompanied by her printed name, date of birth, residence, city or town of residence, and date of signing. *Id.* § 7-9-104. Paid canvassers must be trained about Arkansas law regarding petition gathering by the initiative's sponsor and provided a copy of the Secretary of State's Initiatives and Referenda Handbook. *Id.* § 7-9-111(f)(2)(B)(i) & (ii).

The Secretary of State must verify the signatures within 30 days of receipt, *id.* § 7-9-111(a). The Secretary must notify the initiative sponsor if he determines there are an insufficient number of signatures; if there are sufficient signatures totaling at least 75% of the required amount, the sponsor has a 30 day cure period to obtain additional signatures or prove the validity of existing signatures. *Id.* § 7-9-111(d)(1); *see also* Ark. Const. art. 5, § 1.

## II.     Arkansas Voters First's Independent Redistricting Commission Initiative

Arkansas Voters First ("AVF") is a nonpartisan, nonprofit organization that was founded in February 2020 to sponsor an initiative establishing an independent citizens' redistricting commission in Arkansas. Ex. 1 (Kincaid Dec.) ¶¶ 1-2. In order to meet Arkansas's signature gathering requirements—which AVF's Director describes as "onerous" in the absence of a pandemic, *id.* ¶ 3—AVF hired and paid $210,076 to a firm with extensive experience managing petition drives. *Id.* ¶ 4. The firm interviewed and made offers to dozens of staff, conducted the statutorily required background checks on the canvassers, and opened offices in three Arkansas cities. *Id.* AVF also hired lawyers, negotiated with printers, and coordinated with nonprofit organizations with expertise on redistricting reform. *Id.* AVF has also recruited volunteers to solicit signatures to complement the paid staff. *Id.* ¶ 5. After preparing for the canvassing campaign, AVF launched its petition drive on March 5, 2020, and had canvassers in the field within a week. *Id.* ¶ 6.

4

### III.   The COVID-19 Pandemic and its Effect on AVF Canvassing

#### A.  The Pandemic and the Measures Addressing It

Within days of AVF beginning its canvassing, the Governor issued the first in a series of restrictive Executive Orders dealing with the COVID-19 pandemic. *Id.* The Governor declared an Emergency on March 11, 2020. Ex. 2 (E.O. 20-03). On March 13, 2020, the Governor amended the Emergency declaration, noting that "[c]itizens of this state have been advised to take precautions to prevent the spread of COVID-19, including the advisement to minimize person to person contact, [and to] avoid large gatherings." Ex. 3 (E.O. 20-05). That order suspended requirements that physicians establish an in-person relationship with patients before engaging in telehealth services. *Id.* On March 20, 2020, the Governor suspended provisions of the Arkansas Code that had limited the availability of absentee ballots to certain excuses, "so that all eligible qualified electors" could vote absentee in the March 31, 2020 primary.  He also provided additional time for voters to request absentee ballots. Ex. 4 (E.O. 20-08). On March 23, 2020, the Governor amended the Emergency declaration to extend the tax filing deadline to July 15, 2020. Ex. 5 (E.O. 20-09). On March 26, 2020, the Governor amended the Emergency declaration again and stated that "[t]he entire state is impacted by COVID-19"; he thus "declar[ed] the entire state an emergency disaster area." Ex. 6 (E.O. 20-10). The Governor noted that the "Secretary of Health, pursuant to his authority, has issued a directive restricting gatherings of ten (10) or more people to limit the spread of COVID-19." *Id.* The Governor reiterated that directive, and "prohibited until further notice" gatherings of more than ten people, and noted that this applied to, "without limitation, community, civic, public, leisure, commercial, or sporting events, concerts, conferences, conventions, fundraisers, parades, fairs, and festivals." *Id.* Even where the prohibition did not apply, the Governor advised entities to "limit person-to-person contact and maintain

appropriate social distancing of at least six (6) feet to prevent the spread of the virus." *Id.* The Order noted that violation of the directives was a criminal offense. *Id.*

On March 26, 2020, the mayor of Little Rock established a curfew, generally requiring people to stay in their homes in the evening, and noting that the Surgeon General of Arkansas had "announced a coming 'wave' of COVID-19 infections and urged citizens of Arkansas to abide social distancing and quarantine restrictions." Ex. 7 (Little Rock Curfew Order). The mayor issued a Declaration on April 6, 2020, noting that the President and Governor had recommended Americans wear cloth masks when outside the home, and prohibiting a caravan of five or more vehicles traveling to a location with the intent to exit the vehicles near one another. Ex. 8 (Little Rock Declaration).

The City of Fayetteville has asked residents to only visit parks or trails at times when they are unlikely to encounter others, asked residents to maintain a distance of six feet from each other, has posted signs demonstrating what six feet looks like, and has encouraged residents to actually "give more than six feet if you can – the more space between you and others, the better."[2] The Mayor of Fayetteville suspended the Fayetteville Farmers' Market on March 30, 2020 because it "draws a sizeable crowd of people of all age groups, who come into close contact with each other for hours at a time – and those are all the things we must avoid to slow community spread of this COVID-19 pandemic."[3]

On March 30, 2020, the Governor amended the Emergency declaration to ease witnessing and notary requirements for certain activities. The Governor explained that Arkansas law requires

---

[2] *See* City of Fayetteville, *COVID-19 (Coronavirus Updates & Information*, https://www.fayetteville-ar.gov/3883/Coronavirus-Updates (last visited April 21, 2020).

[3] *Id*.

two witnesses in the presence of testators to effectuate a will and in-person notarization of legal documents. Ex. 9 (E.O. 20-12). Because "[t]he elderly and disabled populations of the state are among the most vulnerable to serious risk of harm to their health and finances because of COVID-19," nursing facilities are restricting the ability of visitors. *Id.* "These vulnerable populations are being deprived of the ability to obtain services and complete essential legal documents necessary to protect themselves, their property, and their loved ones." *Id.* The Governor further explained that "[t]he requirement of in-person witnessing was established for the protection of Arkansas residents, but it now may prevent our most vulnerable populations from receiving legal services in a time of great need." *Id.* Noting that "[v]ideoconferencing technology and electronic signature technology have improved significantly, diminishing the risks of remote witnessing," the Governor suspended the in-person witnessing requirements for wills and notarization of legal documents, *id.* Specifically, the Governor noted that documents could be signed in counterparts and that "real-time audio and visual means may be considered to be either 'in the presence of,' or as an 'in person' witness." *Id.* The Governor provided that acceptable videoconferencing technologies included "Skype, Zoom, FaceTime and other similar technologies." *Id.* The Governor expanded the scope of documents to which the order applied on April 9, 2020. Ex. 10 (E.O. 20-14). And on April 10, 2020, the Governor suspended provisions of state law requiring that corporations and banks hold in-person shareholder meetings, explaining that such meetings should occur "by remote communication." Ex. 11 (E.O. 20-15).

On April 4, 2020, the Governor further amended the Emergency declaration, explaining that "[a]ll Arkansas citizens must observe proper social distancing" and reiterating the previous prohibits. Ex. 12 (E.O. 20-13). This order included additional requirements for those entities remaining open, including that they "[l]imit the number of people who can enter into the facility

at any one time to ensure that people in the facility can easily maintain a minimum six-foot distance from one another," mark six-foot increments on the ground where lines form, provide sanitizer at the entrance, and provide contactless payment systems. *Id.* The order also limited the category of persons who may occupy commercial lodgings; ordered school athletic and extracurricular events to remain canceled; required continued remote working for state employees; required bars, clubs, and restaurants to be closed for dine-in service; required gyms, barbers and other personal care providers to remain closed; and requires casinos to remain closed. *Id.* Moreover, the order permitted cities and counties to take additional measures, including by "imposing curfews and closing city or county parks and facilities." *Id.*

Courts, including this Court, have also responded to the pandemic by issuing orders to limit in-person contact. For example, this Court issued Administrative Order 2020-1 continuing all criminal and civil trials schedule, providing for video conference hearings, canceling naturalization ceremonies, increasing screening for access to the courthouses, and encouraging the public "to use online Court resources or contact the Court by telephone,"  through May 1, 2020. Ex. 13 (W.D. Ark. Admin. Order 2020-1). On March 31, 2020, this Court implemented further provisions of the CARES Act providing for video and telephone conference hearings for criminal matters. Ex. 14 (W.D. Ark. Admin. Order 2020-3). On April 3, 2020, the Arkansas Supreme Court extended its suspension of in-person proceedings through May 1, 2020, noting that the suspension could be extended. Ex. 15 (Ark. Sup. Ct. Order). On April 20, 2020, this Court extended Administrative Order 2020-1, continuing all civil and criminal trials scheduled to begin before June 1 and canceling the May 29, 2020 naturalization ceremony. Ex. 16 (W.D. Ark. Admin Order 2020-4).

As of April 22, 2020, the United States had 802,583 reported cases of COVID-19 and 44,575 reported deaths.[4] Arkansas had 2,262 reported cases and 43 deaths.[5]

**B.  The Effect of the Restrictions on AVF's Ballot Initiative**

As a result of these orders and public health advisories to socially distance and avoid in-person contact, AVF was forced to cease canvassing activity just days after it began, and after obtaining fewer than 100 of the required roughly 89,000 signatures. Ex. 1 (Kincaid Dec.) ¶ 8. As AVF's Director explains, "canvassing is most productive at large public gatherings, such as fairs and farmers' markets, where the canvasser can encounter many potential signatories in a short time." *Id.*; Ex. 17 (Miller Dec.) ¶¶ 13-15 (noting Ms. Miller intended to circulate petitions at large gatherings, including the Fayetteville Farmer's Market, at planned town hall meetings, at grocery stores, and door-to-door). Canvassers also obtain signatures and restaurants and bars, which are now closed. *Id.* Moreover, "AVF was concerned for the health of the canvassers, who, as part of their jobs, necessarily come in close contact with many individuals. AVF could not risk the health of these canvassers by sending them into stores or the few public venues that were still open, or asking them to go door to door soliciting signatures." *Id.*; Ex. 17 (Miller Dec.) ¶ 15 (noting that citizens would not respond to door-to-door visits from strangers during pandemic).

Even if AVF could continue its program of signature gathering, many potential signers are inaccessible to canvassers because they are complying with social distancing and quarantine restrictions. Ex. 18 (Gray Dec.) ¶¶ 6, 7, 8; Ex. 19 (Allen Dec.) ¶¶ 6, 7, 8. This is especially true for Arkansans whose age or immunocompromised status puts them at heightened risk of contracting

---

[4] Centers for Disease Control, Coronavirus Disease 2019, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 22, 2020).

[5] Arkansas Dep't of Health, COVID-19, https://www.healthy.arkansas.gov/programs-services/topics/novel-coronavirus (last visited April 22, 2020).

a case of COVID-19 that could result in severe health problems or death. As one immunocompromised would-be signer of AVF's petition explains, "the risk of leaving the house has grown exponentially. My doctors have advised that I have contact with as few people as possible . . . Because of my condition and the risks of COVID-19, [] both my wife and I limit our in-person contacts to only those that are necessary." Ex. 19 (Allen Dec.) ¶ 6; Ex. 18 (Gray Dec.) ¶¶ 7, 8 (describing the steps a retirement community has taken to prevent the spread of COVID-19 amongst elderly residents, including heavy restrictions on access to the community from visitors from the outside).

Prior to the COVID-19 pandemic, AVF anticipated obtaining the number of signatures required for ballot access. Ex. 1 (Kincaid Dec.) ¶ 10. "With the current restrictions, AVF cannot do so." *Id.* As Mr. Kincaid explains, "[e]ven if the COVID-19 restrictions are gradually phased out, it is still highly unlikely that AVF can collect the required number of signatures so long as the canvassers must swear that they personally witnessed petitioners signing their names." *Id.* Ms. Miller explains that if she and other canvassers are allowed to gather signatures electronically without in-person witnessing, she believes they could obtain "many thousands" of signatures. Ex. 17 (Miller Dec.) ¶ 19.

## LEGAL STANDARD

District courts have "broad discretion when ruling on preliminary injunction requests." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 401 (8th Cir. 2009) (quoting *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004)). The court considers four factors in considering whether to grant a preliminary injunction: (1) "the likelihood of success on the merits," (2) "the presence or risk of irreparable harm," (3) "the balancing of the harms of granting or denying an injunction," and (4) "the public's interest." *Id.*

**ARGUMENT**

**I.    Plaintiffs Are Likely to Succeed on the Merits of their Claims.**

Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment
claims because Arkansas's initiative requirements—including the required number of signatures,
the "wet" signature requirement, the in-person witnessing and notarization requirements, and the
deadline for submission—constitute a severe burden as applied during the COVID-19 pandemic.
Compl. ¶¶ 85-92. Without an order from this Court, the Arkansas laws governing initiated
measures will severely burden the ability of Plaintiff AVF to gain access to the ballot, the ability
of Plaintiff Bonnie Miller to circulate petitions, and the ability of Arkansans like Plaintiffs Robert
Allen and Adella Gray to freely speak in support of AVF and associate with others to place it on
the 2020 ballot. These severe burdens violate the Plaintiffs' First and Fourteenth Amendment
rights of ballot access, free speech, and freedom of association.

The Arkansas Constitution guarantees its citizens the "fundamental rights to petition for
initiatives and referendums." *McDaniel v. Spencer*, 2015 Ark. 94, 23, 457 S.W.3d 641, 657 (2015)
(Hart, J., concurring). The circulation of petitions has long been recognized by the Supreme Court
of the United States to be "core political speech" for which First Amendment protection is "at its
zenith." *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988); *Buckley v. Am. Constitutional Law
Found., Inc.*, 525 U.S. 182, 186 (1999). Although a state may regulate the initiative process, it may
only do so to the extent that it "does not restrict political speech." *Hoyle v. Priest*, 265 F.3d 699,
704 (8th Cir. 2001). When analyzing the constitutionality of an electoral regulation, the Court
"must weigh 'the character and magnitude of the asserted injury to the rights protected by the First
and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put
forward by the State as justifications for the burden imposed by its rule,' taking into consideration

'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The Court should apply "a sliding standard of review to balance these two interests. Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review." *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001); *see also Green Party of Arkansas v. Martin*, 649 F.3d 675, 680 (8th Cir. 2011) (hereafter "the *Anderson/Burdick* test").

A burden that "operate[s] to freeze the political status quo" is severe and warrants application of strict scrutiny. *Martin*, 649 F.3d at 685 (quoting *Jenness v. Fortson*, 403 U.S. 431, 438 (1971)). Likewise, "a law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot," and such a "law impermissibly restricts 'the availability of political opportunity.'" *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Indeed, "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (2016). Even where a burden is properly characterized as less than severe and thus subject to less exacting scrutiny, the court's review is "not . . . rational-basis inquiry." *Green Party of Ark. v. Daniels*, 733 F.Supp.2d 1055, 1062 (E.D. Ark. 2010). Rather, "the Court must evaluate the precise interests advanced by the State," which must be "reasonable and nondiscriminatory," and "must consider the extent to which the State's interest require the burden" imposed." *Id.* In doing so, courts do not consider each regulation in isolation, but rather "evaluate the combined effect of the statutory requirements." *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F.Supp. 690 (E.D. Ark. 1996) (citing *Republican Party of Ark. v. Faulkner County, Ark.,* 49 F.3d 1289 (8th Cir.1995)).

12

In *Esshaki v. Whitmer*, the court enjoined a number of Michigan's requirements for signature gathering for candidate ballot access as severe burdens unsupported by a compelling state interest in light of the COVID-19 pandemic. The court reasoned that the various emergency orders requiring social distancing "ha[ve] pulled the rug out from under [candidates'] ability to collect signatures," have "shuttered" the locations and events at which signatures are normally gathered, leave only "prohibitively expensive" means to obtain signatures. Ex. 20 (Slip Op. at 21) No. 2:20-cv-10831-TGB-EAS (E.D. Mich. Apr. 20, 2020), ECF No. 23. The court noted that "[a]bsent relief, Plaintiff[ ] lack[s] a viable, alternative means to procure the signatures he needs" and thus "he faces virtual exclusion from the ballot." *Id.* The court thus explained that it "ha[d] little trouble concluding that the unprecedented—though understandably necessary—restrictions on daily life . . . when combined with the ballot access requirements . . . have created a severe burden on Plaintiff's exercise of his free speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment—as expressed in his effort to place his name on the ballot for elective office." *Id.* at 21-22 (footnote omitted).

Having found that plaintiff was severely burdened, the *Esshaki* court considered—and rejected—the state's contention that its interest in ensuring candidates had sufficient support to appear on the ballot was compelling and that its requirement of 1,000 signatures by a certain date was narrowly tailored. The court found that the restrictions imposed as a result of COVID-19 "effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days." *Id.* at 25. "[A] state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days." *Id.*

Even if ensuring sufficient support for the candidate were a compelling interest, the court explained, "here the State has not shown that it has a compelling interest in enforcing *the specific numerical requirements* set forth" by Michigan law "in the context of the pandemic conditions." *Id.* at 25-26 (emphasis in original). The court thus concluded that the plaintiff was likely to succeed on the merits and faced irreparable harm, that his harm outweighed any harm caused by relaxing Michigan's signature gathering requirements, and that the public interest warranted a preliminary injunction. *Id.* at 33-34.

The court entered an injunction that (1) reduced by half the number of signatures required for ballot access, (2) extended the deadline to submit signatures, and (3) required the state to implement a "user-friendly" system to "permit signatures to be gathered through the use of electronic mail" and to permit the signature to be "appropriately witnessed . . . through digital means" similar to other witnessing requirements relaxed by the state due to the pandemic. *Id.* at 35-36. As the *Esshaki* court noted, *id.* at 36, courts have granted similar relief to signature gathering requirements as-applied to exigent circumstances. *See Faulkner v. Va. Dep't of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing signature requirement 65% in light of COVID-19); *Graveline v. Johnson*, 336 F.Supp.3d 801, 810 (E.D. Mich. 2018) (granting preliminary injunction and reducing signature gathering requirement for candidate from 30,000 to 5,000) *aff'd Graveline v. Johnson*, 747 F. Appx. 408, 416 (6th Cir. 2018); *Jones v. McGuffage*, 921 F.Supp.2d 888, 899 (N.D. Ill. 2013) (granting preliminary injunction and reducing signature gathering requirements for truncated special election during harsh Chicago winter); *DNC v. Bostelmann*, __ F.Supp.3d __, No. 20-cv-249-wmc, 2020 WL 1638374, at *22 (W.D. Wis. Apr. 2, 2020) (ordering, as modified on appeal, extension of deadline to request absentee ballot, deadline to postmark absentee ballot to election day, and deadline for absentee ballots to be received to six days after election, in light

of severe burdens caused by COVID-19); *Fla. Democratic Party v. Scott*, 215 F.Supp.3d 1250 (N.D. Fla 2016) (extending voter registration deadline in light of Hurricane Matthew).

Here, Plaintiffs do not mount a facial challenge to Arkansas's initiative signature-gathering requirements. Rather, Plaintiffs contend that those requirements are unconstitutional as applied to Plaintiffs during the current COVID-19 pandemic. As Plaintiffs explain below, Arkansas's required number of signatures, its requirements that those be "wet" signatures, that the signing be witnessed in-person, that the canvasser's affidavit be notarized in-person, and the July 3, 2020 deadline for submission constitute unconstitutional burdens on Plaintiffs' First and Fourteenth Amendment rights when combined with the restrictions on in-person contact and closure of public gatherings imposed by the Governor's Executive Orders and recommended by national and state public health authorities in order to minimized the spread of COVID-19. Plaintiffs seek relief limited in scope to the current crisis.

### A. The COVID-19 Pandemic and Response Has Created Severe Burdens for Plaintiffs' Right to Access the Ballot, and to Circulate and Sign Petitions.

Arkansas's signature gathering requirements, in the context of the restrictions imposed as a result of the COVID-19 pandemic, create two separate severe burdens for Plaintiffs. First, several of the requirements necessitate close in-person contact between the canvasser and the voter, and the canvasser and a notary public. These requirements—that the voter make a "wet" signature on a paper petition, that the canvasser witness that signing in-person, and that the canvasser's affidavit be notarized in-person, create insurmountable hurdles in light of the current pandemic and emergency social distancing restrictions. These requirements place a severe burden on potential petitioners like Robert Allen and Adella Gray, canvassers like Bonnie Miller, and on the AVF campaign. Second, the total number of signatures required, and the July 3 deadline to submit them, both constitute severe burdens in light of the pandemic. That burden worsens with each passing

day that the in-person requirements remain in effect, and would remain severe even if the health and legal obstacles are lifted at some point, given the lost time already incurred.

1. **Requiring Wet Signatures To Be Witnessed and Notarized In-Person Is a Severe Burden During the COVID-19 Pandemic.**

Arkansas's requirement that voters sign an initiative with a "wet" signature on paper (rather than an electronic signature) in the presence of a witness, and that the canvasser sign the affidavit in the presence of a notary, are severe burdens in the context of the COVID-19 pandemic and the restrictions imposed by the Governor, local authorities, and public health officials. These requirements are simply impossible to satisfy while social distancing recommendations are in place. *See* Ex. 17 (Miller Dec.) ¶¶ 9-12; Ex. 1 (Kincaid Dec.) ¶¶ 8-10. Plaintiff Bonnie Miller was ready to start collecting signatures within days of the AVF ballot question having been filed with the Secretary of State. Ex. 17 (Miller Dec.) ¶ 8. But she is heeding the warnings of the Centers for Disease Control ("CDC") and the Arkansas Department of Health and sheltering in her home and staying at least six feet from anyone. Ms. Miller would have to threaten her own health and the health of members of her community, and openly violate orders from the state government, if she were to canvass for, and witness, signatures because there is no realistic way she could do this while staying six feet away from people. *Id.* ¶ 11.

Plaintiff Robert Allen wants to sign the AVF petition, but, given that he is immunocompromised due to his chemotherapy treatments, he would have to disobey not only the CDC and Arkansas Department of Health, but also his doctor in order to have his signature on the AVF petition witnessed by a canvasser who could have their affidavit notarized (if his wife were to witness his signature, she would then have to come into contact with a notary to swear to her witnessing the signature, and that would endanger both her health and her husband's). Ex. 19 (Allen Dec.) ¶¶ 2, 6, 8.

Plaintiff Adella Gray lives in Butterfield Trail Village, a continuing care retirement facility that is home to more than 400 seniors. The residents of Butterfield Trail Village are taking "every measure possible" to prevent the spread of COVID-19 in their community, including by severely restricting access to their campus by anyone from the outside. Mrs. Gray cannot meet with a canvasser to witness her signature, and if her husband—the only person with whom she has direct, in-person contact—witnessed her signature, he would have to meet with a notary and put their health in danger. Ex. 18 (Gray Dec.) ¶¶ 7, 8.

Under ordinary circumstances, canvassers are able to gather signatures in person, witness petitioners signing the petition, and later attest before a notary that they did so. However, that ordinary course is unavailable in the current extraordinary situation. Even if Ms. Miller wanted to canvass outside grocery stores or go door to door, and even if she were willing to endanger her health and meet with a notary (and assuming a notary would meet with her), it is extremely unlikely that possible petition signers would get within six feet of Ms. Miller as long as the social distancing recommendations are in place. Ex. 17 (Miller Dec.) ¶ 14-15. Moreover, simply exchanging the petition papers back and forth among various voters and the canvassers would risk exposing every voter who came into contact with the pages—and the canvassers—to a potential vector of COVID-19.

The state has recognized the dangers posed by in-person signing and witnessing requirements during the COVID-19 pandemic. The Governor has suspended laws requiring that wills and certain other legal documents be signed in the physical presence of a witness or notary, instead permitting those requirements to be satisfied by videoconferencing technologies. Ex. 9 (E.O. 20-12). As the Governor acknowledge, "[v]ideoconferencing technology and electronic signature technology have improved significantly, diminishing the risks of remote witnessing." *Id.*

17

Federal courts have found the practical impossibility of compliance with a petition requirement to be a severe burden. As described above, several courts—including the district court in Michigan—have done so because of the unique exigencies caused by the COVID-19 pandemic. But even before the current health crisis, courts had invalidated various signature gathering restrictions. In *Perez-Guzman v. Gracia*, the First Circuit struck down a requirement that each of 100,000 required signatures on a petition (to register a new political party in Puerto Rico) be notarized by an attorney. It did so on the grounds that the state's purported interest in preventing fraud did not outweigh the burden of the notarization process. 346 F.3d 229 (1st Cir. 2003). At the time of the case, the court found that there were fewer than 8,000 notaries in the entire Commonwealth. *Id.* at 230. Similarly, a district court in Nebraska found that a ban on out-of-state residents circulating petitions was a severe burden because plaintiffs showed, through declarations, that it "increases the time and costs of conducting a petition campaign in Nebraska" and plaintiffs pointed to the absence of any "state[w]ide petition effort in Nebraska since the imposition of the residency requirement." *Citizens in Charge v. Gale*, 810 F.Supp.2d 916 (D. Neb. 2011). Conversely, where defendants were able to show that with the challenged regulations in place "approximately 70% of the petitions circulated have qualified to be placed on the ballot," the Eighth Circuit determined that the regulations did not pose a severe burden on plaintiffs. *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001). Currently in Arkansas no citizen-initiated constitutional amendment has qualified for the ballot, though at least thirteen (including AVF) have submitted measures to the Secretary of State's office, and eight have actively campaigned. *Arkansas 2020 Statewide Ballot Issues and COVID-19*, https://www.uaex.edu/business-communities/voter-education/state-ballot-issues.aspx.

The in-person aspects of the signature gathering process—the required "wet" signature on paper and the in-person witness and notarization requirements—are severely burdensome as applied to Plaintiffs given the COVID-19 pandemic because the practical hurdles to gathering signatures in person, let alone the legal and health consequences of such actions, are simply too high to overcome. As such, the combined effect of these requirements and the Governor's COVID-19 restrictions "operate[s] to freeze the political status quo," *Martin*, 649 F.3d at 685, and results in AVF's "virtual exclusion from the ballot," *Libertarian Party of Ky.*, 835 F.3d at 574. These in-person requirements thus pose a severe burden to Plaintiffs' First and Fourteenth Amendment rights.

If signatures could be gathered electronically (without a live witness), via a service like DocuSign, then Dr. Allen and Ms. Gray would be able to show their support for the petition by signing online, Ms. Miller could circulate petition requests online, and AVF could hire a firm to do digital outreach to voters to sign the petition. This would provide an avenue for the core political speech of circulating and signing petitions while adhering to the social distancing requirements due to the COVID-19 pandemic. Ex. 19 (Allen Dec.) ¶ 7; Ex. 18 (Gray Dec.) ¶ 6,8; Ex. 17 (Miller Dec.) ¶¶ 18-19, Ex. 1 (Kincaid Dec.) ¶ 9.

### 2. Requiring that Plaintiffs Gather 89,151 Signatures by July 3, 2020 Is an Insurmountable Burden Under Current Conditions.

In addition to the in-person aspects of Arkansas's signature gathering requirements, the required number of signatures and the deadline for submitting them also pose a severe burden in light of the pandemic. Had the COVID-19 pandemic, and the resulting halt to signature gathering, not occurred, AVF would have gathered the required 89,151, signatures by July 3, 2020. AVF formally filed as a ballot question committee with the Arkansas Ethics Commission on March 10, 2020. Ex. 1 (Kincaid Dec.) ¶ 2, and filed the original draft of their petition with the Secretary of

State on March 16, 2020. Ex. 21 (Petition Filed with Sec'y of State). It had a plan for the petition

drive overseen by an experienced director. *Id*. ¶¶ 1, 3. It had paid $210,076 to a firm with

"extensive experience handling petition drives" to gather signatures, alongside a volunteer effort

to solicit signatures. *Id.* ¶¶ 4-5, Ex. 17 (Miller Dec.) ¶ 8. AVF postponed its signature gathering

efforts beyond March 16 because of the then "developing public health crisis" *Id.* ¶ 7. It has now

gone six weeks without gathering signatures while waiting to see if the crisis would abate, but it

has become "clear that [they] will not be able to gather signatures for the AVF ballot question in-

person in the coming months." *Id.* There are now less than eleven weeks until the July 3 deadline,

by which time AVF will need to have submitted at least 66,864[6] witnessed, notarized, valid

signatures from 15 counties. This would require nearly 1,000 signatures to be gathered every day.

It will be incredibly hard, if not impossible, for AVF to meet this requirement, even if the social

distancing recommendations were removed today. It will take time for people to return to public

places and to feel comfortable going within six feet of a canvasser.

The *Esshaki* court acknowledged the severe burden posed by Michigan's much lower 1,000

signature requirement and approaching deadline in light of the COVID-19 pandemic. Ex. 20 (Slip

Op. at 36-40). Even prior to this pandemic, courts had recognized that certain lengths of time and

deadlines for signature collection can be burdensome under some circumstances and not under

others. In *Citizens to Establish a Reform Party in Arkansas v. Priest*, the district court found a

January deadline with a number of signatures equal to at least 3% of the total vote cast in the last

election placed an unreasonable burden on the ability of a group seeking to qualify as a new

---

[6] If the initial submission on July 3 contains at least 75% of the required signatures from 15 counties then the group may submit additional signatures within thirty days. Ark. Sec'y of State, 2020 Initiatives and Referenda Handbook. https://www.sos.arkansas.gov/uploads/2019-2020_I__R_Handbook_-_Jan_2020.pdf (last visited Apr. 21, 2020), *see also* Ark. Const. art. 5, § 1.

political party to access the ballot. 970 F. Supp. 690 (E.D. Ark. 1996). In that case, evidence from the plaintiffs showed "that the process of obtaining petition signatures was made more difficult by an early January deadline. They experienced difficulty collecting petition signatures in the winter time due to cold temperatures and inclement weather. Persons with whom they spoke indicated a lack of interest because of the holiday season. Potential signatories indicated a specific disinterest in politics so far in advance of the election." *Id.* at 692.

Similarly a district court in South Dakota struck down a combination of laws that restricted ballot access for a political party, citing, *inter alia*, evidence from the plaintiffs that "the combined effect of the "last Tuesday in March" deadline [March 29 as applied] with the 2.5% signature requirement [6,936 signatures as applied] places a severe burden on their constitutional rights. Plaintiffs emphasize in their brief that both of these burdens are exacerbated because of the expense associated with gathering signatures, the difficulty in generating public interest in a third party candidate before the major parties have chosen their nominee, and the fact that signatures would need to be gathered during the winter months in a sparsely populated state." *Libertarian Party of S. Dakota v. Krebs*, No. 4:15-CV-04111-KES, 2016 WL 3211818, at *4 (D.S.D. June 9, 2016); *see also Libertarian Party of Oklahoma v. Oklahoma State Election Bd.*, 593 F.Supp. 118, 122 (W.D. Okla. 1984) ("[t]he combination of the short time allowed for petitioning, the large number of signatures required, the prevention of the party's effective solicitation of signatures, and the unusually inclement weather during the petitioning period resulted in a deprivation of these plaintiffs' constitutional rights.").

The requirement that AVF file 89,151 witnessed, notarized signatures with the Secretary of State by July 3 severely burdens Plaintiffs' First and Fourteenth Amendment rights because the COVID-19 global pandemic means they have less than eleven weeks (at best) in which they can

interact with members of the public—who will likely still be socially reticent—to gather signatures. It is simply impractical for AVF, using the required procedures, to gather the required number of signatures by the July 3 deadline.

### 3.   The Combined Effect of the Initiated Petition Requirements Is to Severely Burden Plaintiffs' Rights.

The combined effect of the various in-person, number, and deadline requirements for gathering initiative petition signatures together with the COVID-19 pandemic and restrictions is a severe burden on Plaintiffs' First and Fourteenth Amendment rights. The Court must carefully review the "character and magnitude" of the burden that each rule imposes on the Plaintiffs' First and Fourteenth Amendment rights, but ultimately "when examining [an] entire statutory scheme it is important to evaluate the combined effect of the statutory requirements." *Citizens to Establish a Reform Party in Arkansas*, 970 F. Supp. at 690. In this case the combined effect of requiring 89,151 wet signatures, that must be witnessed (and notarized) in person, and submitted by July 3, 2020 will be to prevent the proposed amendment being put forth by AVF from being on the ballot in 2020. Moreover, any effort to meet these requirements would jeopardize the public health. If AVF's proposal is not on the ballot in 2020, then it cannot be approved and there can be no Citizens' Redistricting Commission in 2021 when the state legislative and congressional district lines are drawn for the next decade. These requirements thus work together to "freeze the political status quo." *Martin*, 649 F.3d at 685. The current ballot-access requirements, as applied to Plaintiffs in light of the COVID-19 pandemic, are so severe that they would lock in place the redistricting status quo and extinguish any possibility of a Citizens' Redistricting Commission in Arkansas in 2021.

**B. The State Interests in Preventing Fraud and Ensuring Wide Support for Ballot Measures Do Not Outweigh the Plaintiffs' Severe Burdens.**

Two potential justifications the State may offer for ballot access restrictions in Arkansas are to prevent fraud and to ensure widespread support for ballot measures, but those justifications for the current ballot access requirements, as applied to Plaintiffs in the time of COVID-19, do not outweigh the severe burdens on their First and Fourteenth Amendment rights. That is so regardless of whether the Court characterizes the burden as severe—in which case the State must proffer compelling justifications that are narrowly tailored—or instead characterizes the burden as less than severe and subject to a more flexible balancing standard. *See Initiative & Referendum Inst.*, 241 F.3d at 616. Under either level of review, Arkansas's interests are insufficient to warrant the burden imposed as-applied to Plaintiffs during the COVID-19 pandemic.

Arkansas has an interest in preventing signature fraud on ballot petitions, but the regulations that seek to further that interest must be narrowly tailored to justify a severe burden, or otherwise sufficiently justified to "require the burden imposed."  They are neither. As the district court recognized in Michigan, the realities of the COVID-19 pandemic require more tailored requirements that limit in-person contact, reduce the number of signatures, and extend the deadline in order to justify the burdens posed. Ex. 20 (Slip Op. at 22-26). Two state courts have modified the signature requirements for candidates in light of the burden of signature collection while COVID-19 ravages the nation. On March 25, a Virginia Circuit Court reduced the signature requirement from 10,000 to 3,500 for candidates seeking to be on the ballot for the United States Senate race. *Faulkner v. Va. Dep't of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020). And, on April 17, 2020 the Massachusetts Supreme Judicial Court ordered three forms of relief for candidates seeking access to the ballot during the COVID-19 pandemic: first a reduction in the signature requirements by 50%, second an extension of the deadlines for filing of signatures, and

third an order requiring the Secretary of State to accept electronic rather than wet-ink original signatures. The court agreed with petitioners that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to seek elective office." *Goldstein v. Sec'y of the Commonwealth*, No. SJC-12931 (Mass. Apr. 17, 2020).

Even prior to this pandemic, courts had concluded that the justifications proffered here at times failed to support the burdens imposed. In *Buckley,* the Supreme Court recognized that Colorado sought "to protect the integrity of the initiative process, specifically, to deter fraud and diminish corruption." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 204–05 (1999). But, it noted, Colorado "retains an arsenal of safeguards" including making it criminal to forge initiative-petition signatures, and deeming signatures void if the initiative has violated any of the laws governing circulation. *Id.* at 205. In that case, the Court found that the state's interest in preventing fraud did not outweigh the burdens on the First Amendment, namely, requirements that petition circulators be registered voters who wear identification badges and whose name, address, and wages were reported to the state. Likewise, in *McLain v. Meier*, the Eighth Circuit noted, while striking down North Dakota's ballot access requirement of 15,000 signatures (equating to 3.3% of the electorate), that "the number of signatures required by North Dakota is significantly higher than that required in most states." 637 F.2d 1159, 1163 (8th Cir. 1980).

Arkansas's in-person requirements (*i.e.*, collection of "wet" signatures on paper, in-person witnesses, and in-person notarization) are not necessary to further the State's goal of fraud prevention the State could achieve its goal without burdening Plaintiffs' rights, by allowing the collection of digital signatures. Services like DocuSign have numerous procedures in place to ensure "comprehensive security from start to finish" including a digital audit trail, anti-tampering

control, and unalterable, systematic capture of signing data. DocuSign, *Product security*, https://www.docusign.com/trust/security/product-security. The state has recognized as much during the present crisis. *See* Ex. 9 (E.O. 20-12) (suspending various in-person witnessing and notarization requirements and acknowledging the security of electronic signature and video services).

Arkansas also has an interest in ensuring that "the ballot measures enjoy significant support of interested citizens who are registered to vote on them." *Hoyle*, 265 F.3d. at 703. This goal could be furthered without requiring the Plaintiffs to gather 89,151 signatures, a severely burdensome requirement given the COVID-19 pandemic. The Arkansas Constitution requires that initiative measures to amend the constitution be signed by ten percent of the voters of Arkansas, while only eight percent of voters need to sign a regular state-wide initiative. Ark. Const. art. 5 § 1. The signatures of only six percent of the voters are necessary to gain ballot access for a referendum to overturn any general Act or an item of an appropriation bill. *Id.* In each of these other contexts, the law deems the lower percentage sufficient to show a sufficient amount of public support.  It thus would be reasonable for this Court, under the extreme circumstances here, to reduce the signature requirement for AVF to access the ballot to only six percent of the voters of Arkansas (as applied, 53,491 signatures). Doing so would not undermine the state's interest because it would still demonstrate substantial support—well above the amount of support independent candidates for public office in Arkansas must show. *See* Ark. Code § 7-7-103 (requiring candidates to obtain 3% of prior election or 10,000). Moreover, the November general election serves as the ultimate determination of public support. If the initiative is approved by the voters in November, the state can hardly be heard to complain that in the midst of global pandemic that has shuttered people in their homes, a voter-approved initiative had fewer supporting signatures than would otherwise be

required. And if the initiative lacks support, then it will fail at the ballot in November. The state will be unharmed either way.

Arkansas could still prevent fraud and ensure widespread support for the AVF amendment, despite the extreme burdens of the COVID-19 pandemic, by allowing for collection of digital signatures using a service such as DocuSign, by reducing the required number of signatures to six percent, to mirror the number of signatures required in the Arkansas Constitution to place a referendum on the ballot, and by extending to September 3, 2020 the deadline to submit signatures to the Secretary of State.

## II. Plaintiffs Will Suffer Irreparable Injury Without an Injunction.

If this Court does not grant an injunction, Plaintiffs will suffer imminent and irreparable injury. Plaintiffs' fundamental First Amendment rights have been violated and thus irreparable harm can be presumed. Ex. 20 (Slip Op. at 27) (holding that "Ballot access cases such as this implicate First Amendment rights, and when such fundamental rights are violated…irreparable harm can be presumed."). Courts have routinely held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713, (1971)); *Johnson v. Minneapolis Park and Recreation Bd.,* 729 F.3d 1094, 1101 (8th Cir. 2013); *Lowry ex rel. Crow v. Watson Chapel School Dist.*, 540 F.3d 752, 761 (8th Cir. 2008); *Kirkeby v. Furness*, 52 F.3d 772, 774 (8th Cir. 1995).

Here, federal and state guidance in place regarding social distancing and limitations on gatherings due to COVID-19, coupled with state legal requirements for petition signature-gathering, *already* effectively bar Plaintiffs' efforts to get the proposed amendment on the ballot, and will continue to do so indefinitely. Plaintiffs have submitted declarations stating that given the

current restrictions, they cannot meet the state constitutional and statutory requirements for petition

signature-gathering. Ex. 1 (Kincaid Dec.) ¶¶ 8, 10; Ex. 17 (Miller Dec.) ¶¶ 12, 20. For example,

Brett Kincaid, Director of Plaintiff AVF, stated that:

> The restrictions imposed by the Governor, as well as the public fear caused by
> COVID-19, made it infeasible for AVF to continue canvassing for signatures, and
> it suspended its petition drive after obtaining less than 100 of the requisite 89,000
> signatures. Among other reasons, canvassing is most productive at large public
> gatherings, such as fairs and farmers' markets, where the canvasser can encounter
> many potential signatories in a short time. Restaurants and bars are also productive
> venues for canvassing. Because of COVID-19 and the restrictions imposed to
> combat it, those opportunities are no longer available, and it is not clear when they
> will be.

Ex. 1 (Kincaid Dec.) ¶ 8. Far from a minimal burden, the result is that Plaintiffs are required to

ignore the restrictions imposed to combat COVID-19 and attempt to gather signatures, or they can

gather virtually no signatures at all, leaving Plaintiffs with no viable options. In addition, ignoring

the restrictions would not only risk the health of Plaintiffs' as well as countless others, but would

also expose Plaintiffs to prosecution for a misdemeanor followed by a fine of up to $500, possible

time in prison, or both.[7]

Further adding to the irreparable nature of the Plaintiffs injury is that, absent an injunction

against the State's restrictions, the Proposed Amendment will be eliminated from the ballot in a

critical year for the Amendment's actual substantive goal, which is to establish an Independent

Redistricting Commission in Arkansas. Arkansas, like other states, will redraw its state legislative

and congressional maps in 2021 following the 2020 Census. Ark. Const. art. 8, § 4. These maps,

under usual circumstances, last for an entire decade. Thus, if Plaintiffs are not able to get the

Proposed Amendment on the November 3, 2020 ballot, the next opportunity to do so would be

---

[7] *See* Ex. 12 (E.O. 20-13).

*after* new district maps are drawn, likely delaying redistricting reform in the state until 2030 at the earliest.

In sum, without an injunction from this Court, Plaintiffs will continue to suffer irreparable injury. This factor balances heavily in favor of Plaintiffs.

### III. The Balancing of Harm to Others and the Public Interest

When the "Government is the opposing party," as is the case here, the remaining two factors for a preliminary injunction, "harm to the opposing party and weighing the public interest . . . merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public interest in this case favors the issuance of a preliminary injunction, as the issuance of such relief would give Arkansans the ability to demonstrate their support for the Proposed Amendment, which touches on an issue of public importance: the creation of an independent redistricting commission. As the U.S. Supreme Court has recognized, "One way [that states are restricting partisan considerations in redistricting] is by placing power to draw electoral districts in the hands of independent commissions. For example, in November 2018, voters in Colorado and Michigan approved constitutional amendments creating multimember commissions that will be responsible in whole or in part for creating and approving district maps for congressional and state legislative districts." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2507 (2019). Nationwide, independent redistricting commissions are extremely popular across party lines, with at least 60 percent of Democrats, Independents, and Republicans supporting their creation.[8] The Arkansas Citizens Redistricting Commission is also very popular in Arkansas across party lines, with at least 53% of Democrats, Independents, and Republicans

---

[8] *See* New Bipartisan Poll Shows Support for Supreme Court to Establish Clear Rules for Gerrymandering, CLC (Jan. 28, 2019), https://campaignlegal.org/update/new-bipartisan-poll-shows-support-supreme-court-establish-clear-rules-gerrymandering.

stating they would vote in support of the amendment.[9] The people of Arkansas deserve the opportunity to vote on this important issue. It serves the public interest to allow them to do so.

In addition, the Defendant will suffer no harm if an injunction is granted here. Plaintiffs are asking for very limited relief in the face of a global pandemic; relief that would only apply to Plaintiffs' efforts for the November 3, 2020 election. Further, any harm the Defendant may incur pales in comparison to the injury suffered by Plaintiffs. Plaintiffs face a virtual bar from exercising their fundamental constitutional rights to organize to get the Proposed Amendment on the ballot, or the legal and public health risk of violating the State's directives regarding gatherings and social distancing in order to collect signatures. As a federal district court recently held, "the broader public interest is not served by preserving the current signature-gathering scheme at the cost of encouraging [campaigns] and their supporters to risk their health and criminal penalties to gather signatures." Ex. 20 (Slip Op. at 30).

Thus, these factors weigh in favor of granting Plaintiffs' requested injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted such that (1) Plaintiff Arkansas Voters First be permitted to submit either traditional "wet" signatures or electronic signatures through a service such as DocuSign or something similar, (2) the requirement of in-person witnessing of voters' signatures and in-person notarization of canvassers' signatures be enjoined, (3) the required number of signatures for Plaintiffs' initiative be reduced to 6% of the total votes in the last gubernatorial election (*i.e.*, 53,491 signatures), with

---

[9] Andrew Claster, Arkansas Citizens' Redistricting Commission Survey Results (Feb. 1, 2020), https://arvotersfirst.org/wp-content/uploads/2020/04/AVF-Poll-Results-February-2020.pdf. The AVF amendment is listed as "Version 1" in these slides.

a corresponding decrease to the county-level signature thresholds, and (4) the deadline to submit signatures to the Secretary of State be extended to September 3, 2020.

Dated: April 22, 2020

Respectfully submitted,

Ruth Greenwood*
CAMPAIGN LEGAL CENTER
125 Cambridgepark Drive
Cambridge, MA 02140
rgreenwood@campaignlegal.org
(202) 560-0590

Annabelle E. Harless*
CAMPAIGN LEGAL CENTER
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
(312) 312-2885
aharless@campaignlegal.org

/s/ David A. Couch
David A. Couch
DAVID A. COUCH, PLLC
1501 North University Ave
Suite 228
Little Rock, AR 72207
(501) 661-1300
arhog@icloud.com

Robert Weiner*
Mark Gaber*
Christopher Lamar*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
rweiner@campaignlegal.org
mgaber@campaignlega.org
clamar@campaignlegal.org

* Motions for *pro hac vice* forthcoming