**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

| | |
|---|---|
| BONNIE HEATHER MILLER, ROBERT WILLIAM ALLEN, ADELLA DOZIER GRAY, and ARKANSAS VOTERS FIRST, <br><br> *Plaintiffs,* <br><br> v. <br><br> JOHN THURSTON, in his official capacity as Secretary of State of Arkansas, <br><br> *Defendant.* | Case No. 5:20-cv-05070-pkh <br><br> Hon. Paul K. Holmes, III |

**REPLY TO DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs seek to achieve political change in Arkansas by petition, and "their right to freely engage in discussion concerning the need for that change is guarded by the First Amendment." *Meyer v. Grant* 486 U.S. 414, 421 (1988). As defendant recognizes, "[t]he COVID-19 pandemic has burdened Plaintiffs, who seek to place a state ballot initiative on the ballot for the 2020 general election." Def's Br. In Opp. To Mot. for Prelim. Inj., 1, ECF No. 31 ("Def's Br."). But that admitted burden derives not just from the COVID-19 pandemic, but from the application of Arkansas signature gathering laws during the pandemic. The burden will continue as long as the pandemic rages, and the Arkansas initiative petition signature gathering laws are enforced as written. If this Court does not step in to protect Plaintiffs' right to circulate and sign the Arkansas Voters First ("AVF") petition, then the core First Amendment right to political expression for Plaintiff Miller (both to sign and circulate the petition), Plaintiffs Gray and Allen (to sign the

petition), and Plaintiff AVF (to circulate the petition) will be severely burdened. The voters of Arkansas will miss the chance to vote on a redistricting reform amendment, and in 2021 Arkansas' redistricting plans will be drawn without a citizens' redistricting commission.

Defendant's responses are unavailing. First, he mounts a spurious standing argument. He notes that the pandemic is part of the cause of Plaintiff's injuries. But that does not matter. The law is clear that when a government official refuses to alter state voting laws in light of an unforeseen emergency, plaintiffs have standing to sue the official responsible for enforcing the law even if he or she did not create the emergency. Defendant also says the injuries here were self-inflicted. However, the evidence shows that Plaintiff AVF diligently structured its operations so that it would be able to gather the required 89,151 witnessed signatures, with canvasser affidavits notarized, by July 3, 2020, if the pandemic had not arisen. Nothing more is required to establish standing.

On the merits, much of the Defendant's argument hinges on the notion that ballot access for candidates or political parties is worthy of greater protection under the First Amendment than the right of people to circulate and sign petitions for initiatives. Def's Br., 13-14. But the Constitution makes no such distinction. Further, as we show *infra*, once a state extends the right to petition for state constitutional amendments, unjustified burdens imposed on that activity trigger First Amendment scrutiny. Here, the First Amendment right of Plaintiffs Miller and AVF to circulate petitions and engage in the communicative aspects of petitioning has clearly been burdened.

Defendants try to diminish Plaintiffs' right by characterizing it as a "right to place an initiative on the ballot," Defs. Br. at 6, but this is *not* the right asserted by Plaintiffs in this case. Plaintiffs' right to circulate petitions, that is, their right to interactive communication concerning

political change, is what is burdened in the current circumstances.[1] Given that Arkansas has created "fundamental rights to petition for initiatives and referendums," *McDaniel v. Spencer*, 2015 Ark. 94, 23, 457 S.W.3d 641, 657 (2015), any infringement on those rights will be reviewed according to the standard that all initiative petition regulations (and in fact all ballot access restrictions) are judged: under the *Anderson/Burdick* test. That this test applies in the Eighth Circuit was made clear in *Initiative & Referendum Institute v. Jaeger*, where plaintiffs sought to have two laws struck down as unconstitutional (North Dakota's residency requirement for circulators of petitions and its prohibition on commission payments to circulators). 241 F.3d 614 (8th Cir. 2001). Defendants submit that there are a range of Eighth Circuit cases that do not use this standard, but, when reviewed more closely, each of these cases adopt the hallmark of an *Anderson/Burdick* analysis: the Court begins by analyzing the character and magnitude of the burden then, if a burden is found, assessing the precise interests offered by the state to justify that burden.

The burden, which Defendant acknowledges, imposed by the Arkansas signature gathering requirements during the COVID-19 pandemic is not merely a spot of difficulty or an increase in costs that the Plaintiffs must bear. The burden on the Plaintiffs' right to circulate petitions is as severe as they come: Plaintiffs Miller and AVF canvassers cannot go to farmers markets, libraries, restaurants or bars to engage in political speech and circulate petitions, because those venues are closed. Pls Br. at 6, 9, ECF No. 7. AVF cannot send paid canvassers or volunteers to festivals, parades, concerts, sporting events, or conferences, because those events have been cancelled. Compl. ¶ 4, ECF No. 2. AVF and Plaintiff Miller cannot circulate petitions to people like Plaintiffs Gray and Allen because their health situations are so precarious, due to COVID-19, that they cannot accept visitors. Pls. Br. at 9, ECF No. 7. And the circulation of petitions by Plaintiffs to

---

[1] Plaintiffs Gray and Allen assert that their right to sign the AVF petition have been unconstitutionally burdened, and that is assessed under an exacting standard of scrutiny, see *infra* section B.3.

*anyone* would risk spreading the virus and violating the social distancing requirements of remaining six feet from others. The combination of COVID-19 and the ballot access requirements for constitutional amendments is obstructing political speech in Arkansas and placing a severe burden on the right of Plaintiffs to circulate petitions.

Defendant then turns to a set of meager assertions, without offering a shred of recent evidence, about the state interest in ballot access laws to "combat[]fraud" and "ensur[e] that signatures are genuine." Def's Br. at 25-26. In so doing, he cites other administrative deadlines to explain why it supposedly is acceptable to deny Plaintiffs' First Amendment rights by refusing to extend the deadline for submission of petition signatures beyond July 3. But he ultimately fails to explain why that deadline must remain 76 days before ballots are to be printed.[2] *See* Ar. Code. § 7-5-407(a)(1). He also does not address the statutory cure periods that allow for signature collection through the end of August. Given the lack of evidence to substantiate the state's asserted interests, Defendant's last refuge is to claim that those interests satisfy the rational basis standard. However, he does not and cannot show the interests in preventing fraud, ensuring signatures are genuine, or adhering to administrative deadlines justify the severe burden on Plaintiffs, or why those interests would be sacrificed if Plaintiffs got the relief they seek here.

This Court should grant Plaintiffs' motion for a preliminary injunction for the reasons set out in this reply brief and the brief in support of the motion.

## ARGUMENT

### A. Standing and Causation

To demonstrate standing, a plaintiff must prove that he has suffered (1) an injury-in-fact that is concrete and particularized; (2) fairly traceable to defendant's challenged conduct; and (3)

---

[2] Ballots are to be printed 47 days before Election Day, which in 2020 falls on September 17, which is 76 days after July 3, 2020

likely to be redressed by a favorable judgment. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (relying on *Lujan v. Defs. of Wildlife*, 504 U.S. 555) (1992)). Here, Plaintiffs have standing because Defendant's enforcement of Arkansas law, combined with the COVID-19 pandemic, has prevented them from engaging in constitutionally protected activity. Defendant is simply wrong to allege that Plaintiffs lack standing because he has not caused Plaintiffs' injuries or because Plaintiffs' injuries are self-inflicted.

1. **Defendant has caused Plaintiffs' concrete and particularized injury because Defendant is still enforcing Arkansas law in a pandemic.**

Plaintiffs have been injured by the *combined* effect of the COVID-19 pandemic and the enforcement of Arkansas laws that were not designed to operate fairly during a global pandemic. Courts have found that when a government official refuses to alter state voting laws in light of an unforeseen emergency, plaintiffs have standing to bring an action against the official responsible for enforcing the law even if the official did not create the emergency. For example, in *Florida Democratic Party v. Scott*, 215 F.Supp.3d 1250 (N.D. Fla. 2016), the court ordered the Secretary of State to relax Florida's voter registration deadline, because that deadline fell five days after Hurricane Matthew had ravaged the state. In so doing, the court recognized that the injury inflicted on would-be registrants was caused by the *combined* effects of (1) the hurricane and (2) the defendants' refusal to modify the deadline.

To be sure, when election officials are flexible and temporarily change election laws in an emergency to ensure that voters can continue to engage in constitutionally protected activity, courts are obviously more likely to find that those officials have not injured the voter bringing suit. Thus, in *Mays v. Thurston*—which Defendant heavily relies on but misstates—plaintiffs challenged Arkansas law regarding absentee ballots on March 27, 2020 seeking changes to the primary election scheduled for March 31, 2020. No. 4:20-CV-341 JM, 2020 WL 1531359 (E.D.

Ark. Mar. 30, 2020). But, the week before, Governor Hutchinson had issued an Executive Order declaring a state of emergency and suspending provisions of Arkansas absentee ballot law, in particular, allowing all voters to request an absentee ballot. *Id.* The court noted, in light of the Governor's Executive Order, that plaintiffs could have been injured only if they "did not follow the absentee voting requirements as loosened by the Governor or if they do not show up to vote at a designated voting place exercising the social distancing and other protections suggested by the State and the federal government." *Id.* at *2. The court first looked to the actions of the state—the Governor's relaxation of absentee ballot restrictions—and then determined that if *after* the Executive Order, plaintiffs failed to "take advantage of these available avenues to exercise their rights to vote," *then* their injuries are not caused by the state but by the global pandemic. *Id.*

Here, on the other hand, where Defendant has demonstrated no flexibility whatsoever, Plaintiffs' injuries are still fairly traceable to Defendant. Defendant's analysis of *Mays* ignores the Governor's relaxation of the absentee voting requirements affording the plaintiffs other avenues to vote in a pandemic *before* the court determined that the state did not cause the plaintiffs' claimed injuries. Furthermore, Plaintiffs do not need to prove that Defendant is responsible for *every* obstacle impeding their right to interactive communication concerning political change. Instead, Plaintiffs need only to show a "significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see also 281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011) (finding standing where a government official has "some connection" to enforcing a challenged statue and holding that the official does not need to have "the full power to redress a plaintiff's injury."). Enjoining Defendant from enforcing this limited aspect of Arkansas law in a pandemic would significantly increase the

likelihood that Plaintiffs' injuries would be redressed. That is enough to establish Plaintiffs' standing.

### 2. Plaintiffs also have standing because they have been diligent in beginning the process to collect signatures.

Plaintiffs' inability to predict an unforeseeable global pandemic is not a self-inflicted injury. Further, contrary to Defendant's claim, Plaintiffs were diligent in seeking to place AVF's initiative on the ballot. Indeed, Plaintiffs' timetable was well ahead of the successful ballot initiatives in 2018.[3]

AVF structured its operations to ensure that, under any *foreseeable* circumstances, it would be able to gather the 89,151 signatures required to place the proposed amendment on the November ballot. By early March 2020, AVF had, among other things, become a ballot question committee, hired staff, put organizers in the field, solicited volunteers to gather signatures, and entered into a contract with a petition circulation firm. Kincaid Dec. ¶¶ 2, 4-6, ECF No. 7-1. AVF had also hired Brett Kincaid, a veteran of Arkansas petition drives, to head the petition-gathering effort. *Id.* ¶ 3. AVF launched its petition campaign on March 5, 2020, just as the weather was warming and the large public gatherings crucial to signature gathering were becoming more common. *Id.* ¶ 6. Before the coronavirus pandemic forced AVF to pause its signature-gathering efforts, Mr. Kincaid "was confident that the petition drive would collect the requisite signatures by the statutory deadline." *Id.* ¶10.

Mr. Kincaid's optimism was not misplaced. Defendants argue that Plaintiffs were not diligent in beginning the process to collect signatures because AVF did not become a ballot question committee until March 10, 2020. History says otherwise. For example, during the 2018

---

[3] "Diligence" is not a factor to determine standing. Defendants appear to rely on *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020), for this proposition. But, as will be discussed below, this Court should give no weight to that court's preliminary injunction analysis.

cycle, two initiated measures successfully made it to the ballot.[4] The Arkansas Attorney General cleared both measures to begin gathering signatures on May 23, 2018.[5] The sponsors of those measures had to submit their signatures to the Attorney General's office by July 6, 2018, subject to the 30-day cure period if the petition had at least 75 percent of the required signatures.

Here, Plaintiffs were much *more* diligent. AVF got the authority to begin collecting signatures on March 16, 2020—over *two months earlier* than the 2018 initiatives. Compl. Ex. 7. Had Plaintiffs been able conduct canvassing at large public gatherings, such as fairs, farmers' markets, and restaurants, as they planned before the pandemic, they would have collected the requisite signatures. Unless diligence requires foreseeing the unforeseeable, Plaintiffs' efforts qualify as diligent.

Even if Plaintiffs had not been diligent in beginning the process to collect signatures, that would not justify stifling their constitutional rights. In *Esshaki v. Whitmer*, for example, a Michigan federal district court held that a candidate who entered the race late was still entitled to relief, even though other candidates in the same race had already qualified for the ballot. No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *8 (E.D. Mich. Apr. 20, 2020), appeal docketed, No. 2:20-1336 (6th Cir. Apr. 22, 2020). And in *Warren v. Griswold*, a Colorado state court held that a candidate who had intentionally waited until the last two weeks of the signature-gathering period to collect the majority of her signatures had nonetheless made "a good faith effort" to qualify for the ballot. No. 2020-CV-31077, slip op. at 27 (Dist. Ct. Apr. 21, 2020).[6] The court ordered that the

---

[4] Arkansas changed its ballot initiative process in 2019. Prior to the change, the Attorney General was responsible for certifying initiative petitions prior to supporters of the initiatives were permitted to collect signatures. *See* Ark. Code Ann. 7-9-107.
[5] Rachel Herzog & John Mortiz, *Arkansas Attorney General Approves 4 Ballot Measures Hours After High Court's Ruling*, Arkansas Democrat Gazette (May 23, 2018), https://www.arkansasonline.com/news/2018/may/23/arkansas-supreme-court-ag-has-3-days-approve-or-re/?f=news-arkansas
[6] http://ballot-access.org/wp-content/uploads/2020/04/ORDER-REGARDING-PETITION-FOR-DECLARATORY-RELIEF.pdf

candidate be added to the ballot, even though she had only collected 51% of the signatures required under normal circumstances.

The facts in the single decision upholding state ballot access laws in the face of COVID-19, *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020), differ markedly from the facts here. In *Hobbs*, supporters of two ballot initiatives argued that the pandemic eliminated their ability to comply with Arizona law that required in-person signature gathering for initiative petitions. *Id.* at *2. Plaintiffs sought access to a state-run system to obtain electronic signatures for their respective initiatives. *Id*. The court held that plaintiffs lacked standing to sue: the plaintiffs had not challenged all relevant state constitutional provisions regulating signature gathering and thus failed to show redressability. *Id.* at *7-*11. Although the court found plaintiffs' lack of standing dispositive, it improperly issued an advisory opinion regarding plaintiffs' motion for injunctive relief. *See, e.g.*, *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019) ("In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims, *and the court is powerless to continue*.") (emphasis added). The court found that plaintiffs had not satisfied the Ninth Circuit's requirement that challengers to initiative processes show that "a reasonable diligent initiative proponent" would have failed to place an initiative on the ballot under the challenged statutory regime. 2020 WL 1905747 at *22. The court relied heavily on the fact that other Arizona initiative campaigns had already gathered the required signatures to appear on the ballot. *Id.* at *20. Even though plaintiffs argued that they had "sound reasons . . . to delay the ramp-up" of the signature-gathering process until this spring, *Id.* at *11, n.12, the court found that plaintiffs had chosen to "put all its eggs in the March/April basket" when other alternatives were available. *Id.* at *21, n.13. While recognizing that the Plaintiffs were "hardly the only members of

our community who failed to anticipate and plan for a once-in-a-century pandemic" the court held that Plaintiffs should have begun collecting signatures earlier, as had the other initiatives that qualified for the ballot before COVID-19 struck. *Id*.

*Hobbs* is inapposite here. First, once the *Hobbs* court held that plaintiffs lacked standing, its analysis was at an end. The court's advisory opinion regarding the merits of plaintiffs' case was improper and should be disregarded.[7] *Berry*, 912 F.3d at 1335. Second, the facts before that court are materially different than the facts here. In contrast to the success of the other signature gathering efforts that *Hobbs* cited, here eight ballot measure campaigns have been filed with the Arkansas Ethics Commission.[8] Not one has yet qualified for the ballot. Defendant focuses on ballot question committees formed and the measures that have been certified to *collect* signatures but omits any reference to measures that have successfully *gathered* enough signatures—because there are none.

Separately, Defendant's discussion of Plaintiffs' alleged negligence only focuses on the actions of ballot question committees *before* the pandemic fundamentally altered Arkansans' abilities to engage in direct democracy. For example, Defendant claims that AVF was not diligent, in part, because it was the last ballot question committee to receive certification to collect signatures. This ignores the very real probability that other ballot initiative groups might have come along later but decided against investing resources in an initiative this year precisely because of the pandemic. As previously discussed, supporters of the redistricting initiative do not have that luxury. If this measure does not appear on the November 2020 ballot, the goals of the initiative—fairness and transparency in the redistricting process—are unlikely to be realized until 2031.

---

[7] The court's standing analysis, however, still holds precedential weight. The court's standing analysis focused only on redressability and did not discuss the traceability factor.

[8] *Arkansas 2020 Statewide Ballot Issues and COVID-19*, Univ. of Arkansas Div. of Agriculture: Research & Extension, https://www.uaex.edu/business-communities/voter-education/state-ballot-issues.aspx

Moreover, Defendant's claims that AVF did not diligently pursue a signature-gathering campaign do nothing to address the harms suffered by other Plaintiffs in his case. Even if AVF had a responsibility to foresee an unforeseeable global pandemic, and even if AVF shirked that responsibility, Robert Allen and Adella Gray *still* have a First Amendment right to associate with the AVF campaign and to express their views by signing a petition—a right neither can vindicate without a remote signature option, because neither can safely risk even the slightest exposure to COVID-19. Gray Dec. at 7; Allen Dec. at 6.

## B. The Correct Legal Standard Is the *Anderson/Burdick* Balancing Test.

Arkansas' ballot access laws burden Plaintiffs' First and Fourteenth Amendment rights as long as the COVID-19 pandemic, in combination with the state's ballot access requirements, remove the ability of Plaintiffs Miller and AVF to circulate the AVF petition, and Plaintiffs Gray and Allen to sign the AVF petition.[9]

Defendant himself recognizes that the First Amendment is implicated by a ballot initiative regulation "where the regulation[s] 'become[] invalid interactive speech restrictions.'" Def's Br. at 16. This is precisely the type of restriction facing Plaintiffs in this case—they seek to interact to discuss and gather signatures to support political change in Arkansas but due to the global pandemic and Arkansas law, they cannot do so. Despite this admission, Defendant's brief goes on to suggest that a rational basis standard applies because, he claims, Plaintiffs are challenging "*only* laws governing the process by which initiatives are placed on the ballot." *Id.* In fact, the applicable constitutional standard is the *Anderson/Burdick* balancing test.

### 1. Burdens on the right to circulate a petition are assessed using the *Anderson/Burdick* balancing test in the Eighth Circuit.

---

[9] Defendants suggest that the Fourteenth Amendment claim is not "addressed or analyzed" but it is the Fourteenth Amendment that makes the First Amendment prohibitions applicable against the states. *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (explaining the finding of *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940)).

Defendant's response to Plaintiffs' Motion for Preliminary Injunction hinges on his assertion that ballot access for candidates or political parties is worthy of greater protection under the First Amendment than the right of people to circulate and sign petitions. Def's Br. at 13-14. But the Constitution makes no such distinction. A state is not required to extend the right to petition for state constitutional amendments, *but* once that right has been established, it entails political expression and "interactive communications concerning political change" and is therefore "core political speech" for which First Amendment protection is "at its zenith." *Meyer*, 486 U.S., 422 (1988); See also *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) (in *Meyer*, "[a] unanimous Court concluded that although the right to an initiative is not guaranteed by the federal Constitution, once an initiative procedure is created, the state may not place restrictions on the exercise of the initiative that unduly burden First Amendment rights"). Further, the Supreme Court has specifically explained that, "[i]nitiative-petition circulators . . . resemble candidate-petition signature gatherers . . . for both seek ballot access." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999).

Putting aside any political party or candidate ballot access cases, restrictions on the right to circulate petitions and access the ballot are reviewed under the *Anderson/Burdick* test as laid out in *Timmons v. Twin Cities Area New Party*. *Id.*, 216 (Stevens J, concurring in part). The Eighth Circuit made clear that the test applied to the circulation of petitions in *Initiative & Referendum Institute v. Jaeger*, a case where plaintiffs sought to strike down two laws regulating the petition gathering process. The court explained:

> [t]he Supreme Court has stated that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions" because there is "'no substitute for the hard judgments that must be made.'" *Buckley,* 525 U.S. at 192, 119 S.Ct. 636 (quoted case omitted). While states have "considerable leeway to protect the integrity and reliability of the initiative process," at the same time, the First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." *Id.* at

191–92. The Supreme Court has developed a sliding standard of review to balance these two interests. Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review. *See Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358–59 (1997) (laying out flexible standard); *But cf. Buckley,* 525 U.S. at 208 (Thomas, J., concurring) (questioning whether serious and lesser burdens can be adequately distinguished)."

*Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001).

The laws at issue in *Jaeger* required that petition circulators be North Dakota residents and prohibited paying them by commission. Though plaintiffs explained that the residency law would make "it more costly and time consuming to collect signatures," the Court found "no evidence in the record…regarding what the additional cost to appellants would be." *Id.* at 617. The Court also noted that there were still 476,000 eligible North Dakota voters who could circulate petitions. After reviewing the evidence of the state's interest in having petition circulators subject to state subpoena powers, the Court upheld the residency requirement as constitutional. The Court then turned to the law that prohibited compensating petition circulators by commission. Again, the court found that the plaintiffs/appellants had produced "no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures." *Id.*, 618. Again, the Court weighed this modest burden against the state's evidence that the commission prohibition addressed a specific problem related to signature gathering (namely "irregularities- taking names out of the phone book, etc."). *Id.* The court again concluded that the state had submitted evidence of the interests served by the laws, while the plaintiffs had offered none (beyond mere assertions) as to the diminution in speech that the laws would cause.

The bald assertions here are coming from Defendant, while Plaintiffs have carefully documented the burdens imposed by Arkansas law. In Arkansas, there are currently zero people (paid or volunteer) who can gather signatures at festivals, sports games, the rodeo, farmer's

13

markets, and other large public gatherings, because these events have been cancelled. There are no public spaces where current state and federal recommendations, guidelines, and orders would suggest canvassers come within six feet of possible petition signers, because social distancing guidelines remain in place, and even the passing of petition papers and pens would risk spreading the virus. And there are individuals like Plaintiffs Gray and Allen who, absent relief from this court, will be completely unable to sign the AVF petition.

**2. A rational basis standard does not apply where the right to circulate petitions is burdened.**

Defendant's claim that a rational basis standard applies is premised on irrelevant cases or misinterpretations of relevant cases. The *only* case Defendant can cite to support its proposition that a rational basis standard applies is *Jones v. Markiewicz-Qualkinbush* from the Seventh Circuit. 892 F.3d 935, 937 (7th Cir. 2018).  But that case is out of step with governing law.  There, the Seventh Circuit applied a rational basis standard when reviewing the state's rule that only three initiatives may be on the ballot at each election. But it cited no cases in support of the choice of that standard, and failed to distinguish *Meyer v Grant*. This decision, from another circuit, stands alone amid the dozens of cases that rely on *Anderson/Burdick* to determine whether burdens on the First Amendment right to circulate a petition and speak in support of that petition are constitutional.

Defendant then discusses a string of cases from the Eighth Circuit in which the court found that various laws related to signature gathering did not in fact burden the right to circulate a petition or engage in communication concerning a political change. But those cases do not help his cause here.

For example, in *Dobrovolny*, the court noted that if a statute restricts "the type of interactive communication concerning political change" then "exacting scrutiny" would apply. In that case,

though, the court held that the Nebraska law (which required a number of signatures equal to a percentage of voters registered at the time the signatures are submitted) was not a burden on petition circulation because it "in no way restricted their ability to circulate petitions or otherwise engage in political speech." 126 F.3d 1111,1112 (8th Cir. 1997). Having found no burden on the right to circulate petitions, the court did not need to go on and review the state's interests in the law.

Similarly, in *Wellwood v. Johnson*, the Court found that an increase in the amount of signatures required to place an initiative on the ballot for "local-option elections" "in no way burden[ed] the ability of supporters of local-option elections to make their views heard." 172 F.3d 1007, 1009 (8th Cir. 1999). In *Bernbeck v. Gale*, the Nebraska district court carefully explained that the balancing test set out in *Timmons* applies when reviewing whether a First Amendment burden exists and is unconstitutional. In that case the challenged law required signatures equal to five percent of the registered voters in the state (including a certain number of signatures from a broad swathe of counties) be filed in order to place an initiative on the ballot. The court found that this signature requirement placed "no hindrance on the ability to speak, organize, or circulate petitions," and so it did not need to apply strict scrutiny to the state's interests. With no burden, there could be no First Amendment violation. 58 F. Supp. 3d 949, 956 (D. Neb. 2014), *vacated and remanded,* 829 F.3d 643 (8th Cir. 2016). Finally, in *Hoyle v Priest*, the Western District of Arkansas, in reviewing whether a requirement that only registered voters' signatures be counted as supporting initiative petitions, engaged in a balancing of the purported burden as against the state interests, concluding "[b]ecause the state law regulating the initiative procedure does not restrict political speech and the state's interest in protecting the integrity of its initiative process is

paramount, we hold that the challenged requirement is constitutionally sound." *Hoyle v. Priest*, 265 F.3d 699, 704 (8th Cir. 2001).

### 3. The right to sign a petition is assessed under the "exacting scrutiny" standard.

The right to *sign* (as opposed to circulate) a petition under state law is recognized as a distinct right worthy of First Amendment protection. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194-5 (2010) ("An individual expresses a view on a political matter when he signs a petition under Washington's referendum procedure…the expression of a political view implicates a First Amendment right. The state, having "cho[sen] to tap the energy and the legitimizing power of the democratic process, ... must accord the participants in that process the First Amendment rights that attach to their roles." *Republican Party of Minn. v. White,* 536 U.S. 765, 788 (2002) (internal quotation marks and ellipsis omitted). Whether restrictions on petition signing are so severe as to be unconstitutional is determined through application of the intermediate or "exacting" scrutiny standard. *See Kendall v. Balcerzak*. 650 F.3d 515, 525 (4th Cir. 2011) *citing Doe v. Reed,* 561 U.S. 186, 201. Exacting scrutiny "requires a 'substantial relation' between the [regulation] and a 'sufficiently important' governmental interest." *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 366–67 (2010), *citing Buckley v. Valeo*, 424 U.S. 1, 64 (1976). In the case of *Doe v. Reed*, the Court found that the burden of disclosure of petition signer's names to be a modest one, yet the regulation was "substantially related to the important interest of preserving the integrity of the electoral process." *Doe*, 561 U.S., at 199 (2010).

The exacting scrutiny standard also asks the Court to assess the evidence as to the burden on the Plaintiffs' rights to political expression, and weigh it against the evidence of the state's interest in the challenged law to determine if the law is substantially related to an important interest. Given this, the Court can assess both the burden on the right to circulate a petition and the

right to sign a petition by a factual inquiry into the evidence of the burden on the Plaintiffs and the precise interests out forward by the state for enforcement of the laws in question.

### 4. COVID-19 and the Arkansas ballot access laws severely burden Plaintiffs' right to circulate and sign the AVF petition.

Defendant claims that "a content-neutral, nondiscriminatory statute…is not suddenly rendered unconstitutional by the presence of a public health risk" and that the "conditions of a pandemic [cannot] suddenly transform a reasonable ballot access provision into an attempt by the state to restrict "communicative conduct." Def's Br. at 23, 26. But this is *precisely* how as-applied (as opposed to facial) challenges work. *Compare United States v. Salerno,* 481 U.S. 739, 745 (1987) (a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid,") with *Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.,* 226 U.S. 217, 220 (1912) ("How the state court may apply [a statute] to other cases, whether its general words may be treated as more or less restrained, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now").

This is an as-applied case. Plaintiffs do not challenge the Arkansas ballot access requirements in general, and the same Plaintiffs would not be able to make out a case if it were not for the combined effect of COVID-19 and the ballot access laws. Plaintiffs explicitly ask this court to issue a ruling applicable only "in the extraordinary situation presented by the coronavirus epidemic," Compl., 19-20, ECF No. 2.

Plaintiffs have outlined these extraordinary circumstances in their Complaint and Brief in Support of Motion for a Preliminary Injunction. Briefly, Plaintiff Miller is burdened because she fears for her health and the health of the people with whom she would interact if she engaged in in-person petition circulation. Miller Dec. ¶ 9-15, ECF No. 7-17. Plaintiff AVF is burdened because it cannot place paid signature gatherers, or volunteers, into the field as long as social

distancing requirements remain in place and large events are banned. Kincaid Dec. ¶ 8-10, ECF No. 7-1. The burden on Plaintiff Miller and AVF's ability to circulate petitions is also demonstrated by the evidence from Plaintiff Gray and Plaintiff Allen, both of whom cannot interact with a canvasser because the former's retirement community will not accept visitors, and the latter has doctor's orders not to interact while he is immunocompromised due to chemotherapy treatments. Gray Dec ¶ 7, 8, ECF No. 7-18; Allen Dec. ¶ 2, 6, 8, ECF No. 7-19. Arkansas law results in the complete denial of Plaintiff Gray's and Plaintiff Allen's First Amendment right to sign the AVF petition.

If the evidence of cold temperatures and a lack of interest by the public in signing a petition for a new political party in January was sufficient for the Eastern District of Arkansas to strike down a January signature deadline in 1996, then a global pandemic is surely reason enough to enjoin the operation of burdensome ballot access rules for AVF in 2020. *See Citizens to Establish a Reform Party in Arkansas v. Priest*. 970 F.Supp. 690, 692, 698 (E.D. Ark. 1996) (applying strict scrutiny but noting that even if the court applied the *Burdick* sliding-scale test, it would strike down the law because the injury to the plaintiffs "is most severe in that it denies them ballot access" and the state could offer no legitimate state interest to justify that burden).

## C. Defendant Fails to Adequately Explain How its Identified State Interests Justify the Severe Burden on Plaintiffs.

Defendant argues that his refusal to relax the signature gathering rules is justified by the state's need to "combat[]fraud" and "ensur[e] that signatures are genuine." Def's Br. at 25-26. But in the absence of any *current* evidence as to fraud in signature gathering, Defendant relies on a finding of fraud in the signature procurement process in a nearly century-old case. In 1938, petition circulators forged "hundreds of names" and the Court found these signatures not to be genuine.

18

*Hargis v. Hall* 196 Ark. 878, 120 S.W.2d 335, 339 (1938). That one old case provides scant support, and sheds no light on why the state cannot allow electronic signatures.

Defendant's interest may more correctly be stated as requiring that sufficient information be provided to ensure that he can judge whether the apparent signer of the petition did in fact agree to sign the ballot petition. That is an interest that can be protected even if signatures are gathered electronically. The Director of AVF, Brett Kincaid, explains that it is possible to use DocuSign to collect the statutorily required information along with a traced electronic signature. See Ex. 1 (Second Kincard Dec.) ¶¶ 2-5. AVF signed a contract with DocuSign on May 1 to set up a service that can be deployed if and when this Court grants the requested relief. *Id.* ¶ 2. Mr. Kincaid attached two sets of screenshots to his declaration, showing how the electronic gathering of signatures would appear to a petition signer, one showing a test site established for an Ohio petition and one using a live site that is currently gathering signatures for a petition in Michigan. *Id.* Exs. 2-3. In the latter case, the screenshots show how the user is given a box in which to trace their signature using a mouse, trackpad, or finger or stylus on a touchscreen. *Id.* ¶ 5 and Ex. 3. In this way, signatures will still be "handwritten" though they will not be "wet," and the state can match the name, date of birth, and state ID number of the petition signer against the information on the voter roll. Mr. Kincaid also attaches an information sheet on a DocuSign service called "Identify Platform & ID Verification" that AVF can add to the electronic signature gathering process. *Id.* ¶ 6 and Ex. 4. That service would require petition signers to take a photo or otherwise upload a copy of a photo ID, so that the state would have an additional way to verify the identity of the petition signer. Signing a petition in someone else's name remains a Class A misdemeanor, Ark. Code § 7-9-103(b), and is a deterrent that, along with the specific information requested by the online version of the petition, will preserve the integrity of the initiative process in Arkansas.

Indeed, Arkansas is *already* using DocuSign services in the administration of various government functions. The state signed a contract with Carahsoft Technology Corporation in December 2019 for Cloud Solutions that include the use of DocuSign technology. *See* Ex. 5 (Participating Addendum for Arkansas dated December 30, 2019).

Defendant also asserts a state interest in the orderly administration of elections. Def's Br. 26-27. However, the only applicable ballot printing deadline Defendant cites is 47 days prior to Election Day, which in 2020 is September 17. *See* Ar. Code. § 7-5-407(a)(1). Defendant fails to explain how the very severe burden on Plaintiffs of requiring petition signatures to be submitted 76 days before the ballots must be printed is justified by the state's interest ensuring that its election officials can "timely comply with various other, interrelated election deadlines" by which electronic signatures could be gathered and validated. Further, in 2018, Defendant permitted one ballot measure to submit cure period signatures on August 24, 2018, another on August 29, 2018. *See* Ex. 2 (Letter from Ark. Sec. of State to Nate Steel, dated July 25, 2018 setting cure period deadline for August 24, 2018) and Ex. 3 (Letter from Ark. Sec. of State to David Couch, dated July 30, 2018, setting cure period deadline for August 29, 2018). Similarly, in 2016 Defendant permitted a ballot initiative to submit cure period signatures on August 29, 2016. *See* Ex. 4 (Letter from Ark. Sec. of State to David Couch, dated July 28, 2016, setting cure period deadline for August 29, 2016). Defendant offers no evidence as to why he would be injured here but was not injured in previous years.

Given the weakness of these claimed interests, it is no surprise that Defendant only claims they satisfy rational basis scrutiny. Under the correct standard, the burdens on Plaintiffs' rights far outweigh the concerns Defendant has managed to conjure up.

## CONCLUSION

The Arkansas constitution and statutory requirements for petition signature gathering severely burden Plaintiffs' right to circulate and sign the AVF Petition. Plaintiffs have demonstrated, in their brief in support of the motion for preliminary injunction, ECF 7, and in this reply, a likelihood of success on the merits in this case; that they will suffer irreparable harm if the Court does not order relief; and that the public interest favors the issuance of an injunction because it would allow Arkansans to demonstrate their support for redistricting reform, an issue of public importance, while not causing any harm to Defendant.

Plaintiffs respectfully request that the Court grant their Motion to for a Preliminary Injunction and protect the rights of Arkansans to circulate the AVF petition despite the scourge of COVID-19.

Date:   May 6, 2020

Respectfully submitted,

David A. Couch
DAVID A. COUCH, PLLC
1501 North University Ave
Suite 228
Little Rock, AR 72207
(501) 661-1300
arhog@icloud.com

Annabelle E. Harless*
CAMPAIGN LEGAL CENTER
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
(312) 312-2885
aharless@campaignlegal.org

/s/ Ruth M. Greenwood
Ruth Greenwood*
CAMPAIGN LEGAL CENTER
125 Cambridgepark Drive
Cambridge, MA 02140
rgreenwood@campaignlegal.org
(202) 560-0590

Robert Weiner*
Mark Gaber*
Christopher Lamar*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
rweiner@campaignlegal.org
mgaber@campaignlega.org
clamar@campaignlegal.org

* Admitted *pro hac vice*